**FARLEY, Postmaster General, v. UNITED STATES ex rel. WELCH.**

No. 6948.

United States Court of Appeals for the District of Columbia.

Submitted June 14, 1937.
Decided Aug. 2, 1937.

534

Leslie C. Garnett, U. S. Atty., and Howard Boyd, Asst. U. S. Atty., both of Washington, D. C., for appellant.

Fred B. Rhodes, Cooper B. Rhodes, and Robert F. Klepinger, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, GRONER, and STEPHENS, Associate Justices.

GRONER, J.

This is an appeal in a mandamus case. Frank M. Welch—petitioner in the District Court—is a railway postal clerk. His service began July 23, 1929. At that time clerks in the railway mail service were divided into two classes and seven grades.[1] Grade 1 salary was $1,900 per annum, grade 2, $2,000, and so on up to grade 7, in which the salary was $2,700. If the employee was assigned to a terminal railway post office and was in class A (less than twenty employees), he could be promoted as high as grade 4. In class B he could be promoted to grade 5. Promotion was compulsory at the beginning of the quarter following a total satisfactory service of 306 days in the next lower grade. It is stipulated in this case that petitioner's services were at all times satisfactory. It may be inferred that on July 1, 1930, petitioner advanced by virtue of the statute to grade 2, and on July 1, 1931, advanced to grade 3; at any rate, the record discloses that he was in grade 3 in December, 1931, and was employed in a class B terminal. On July 1, 1932, under normal conditions he would have advanced to grade 4, and on July 1, 1933, to grade 5. But on June 30, 1932, Congress enacted the so-called Economy Act.[2] Title 2, § 201, of the act is as follows: "All provisions of law which confer upon civilian or noncivilian officers or employees of the United States Government * * * automatic increases in compensation by reason of length of service or promotion are suspended during the fiscal year ending June 30, 1933; but this section shall not be construed to deprive any person of any increment of compensation received through an automatic increase in compensation prior to July 1, 1932."

The provisions of section 201 were continued in force during the fiscal year ending June 30, 1934.[3] As a result of these provisions petitioner was barred from receiving two increases in pay which he would otherwise have received by force of statutory promotion. On March 28, 1934,[4] Congress suspended the ban on salary increases for the fiscal year ending June 30, 1935, so far as it applied to the class in which petitioner was employed, at the same time providing that the termination of the ban should not authorize the payment of back compensation. The effect of this provision was to restore as of July 1, 1934, annual automatic pay increases to employees in petitioner's class. Shortly after the passage of the last-mentioned act the Postmaster General (May 7, 1934) wrote to the Comptroller General, calling his attention to the various statutory provisions we have re-

---

[1] Act Feb. 28, 1925, 43 Stat. 1062, tit. 1, § 7 (39 U.S.C.A. § 610). (The class depended upon the number of employees in the particular work.)

[2] 47 Stat. 382, 403 (5 U.S.C.A. § 673 note).

[3] 48 Stat. 8, 13, tit. 2, § 4 (5 U.S.C. A. § 673 note).

[4] 48 Stat. 509, 522, 523, tit. 2, § 24 (5 U.S.C.A. § 673 note).

ferred to, and saying: "It is the opinion of the Post Office Department that an employee on July 1, 1934, [the effective date of the lifting of the ban] should be assigned to the salary grade he would have reached had not the automatic promotions been temporarily suspended, although it is understood that the employee would not be entitled to any back compensation."

The Comptroller General rejected this construction of the law on the theory that the promotion statutes should be regarded as not having been in existence during the period July 1, 1932, to June 30, 1934, inclusive. He advised the Postmaser General that in this view not only could there be no increase in compensation during the suspension period, but also that service during that period could not be included in computing "longevity"—that is, that the Economy Act had suspended promotions from grade to grade whether with or without the accompanying pay increase.

Upon the receipt of this ruling the difference of opinion between these high officers of government was brought to the attention of Congress, and an amendment to the Act of March 28, 1934, was prepared and passed June 27, 1934,[5] which provides inter alia: "That in the administration of the provision of subparagraph (1) of section 24 of the Independent Offices Appropriation Act, 1935, [Act of March 28, 1934] amending section 201 of part II of the Legislative Appropriation Act for the fiscal year 1933, [the Economy Act] all service rendered by postal and other officers and employees prior to July 1, 1932, and subsequent to June 30, 1932, shall be credited to the officers or employees and such officers or employees promoted to the grade to which they would have progressed had section 201 (suspending automatic increases in compensation) of part II of the Legislative Appropriation Act, fiscal year 1933, not been enacted." Section 1.

The report[6] of the House Committee having the bill in charge contains the correspondence between the Comptroller General and the Postmaster General, and in explanation of the amendment to the act shows that it was thought by Congress to be necessary to avoid the rule mistakenly applied by the General Accounting Office.

If this were all, it might be safely assumed this controversy would not have arisen, but on June 14, 1934,[7] Congress passed an act amending the Classification Act of February 28, 1925, supra, in which it was provided that clerks in terminal railway post offices should progress successively to grade 4, that is to say, the limit of statutory promotion was reduced one grade—but providing also that no such employee should be reduced in rank and salary as the result of the provisions of the section, that is to say, the reduction should not apply where a clerk had previously reached a higher grade. The Postmaster General construed this act as limiting automatic promotions to grade 4 in all cases in which the incumbent was not then officially classified in the higher grade, in consequence of which on July 1, 1934, the suspension date of the Economy Act provision, he promoted petitioner from grade 3 to grade 4. Petitioner, however, claims he was entitled to be classified in grade 4 on or as of July 1, 1932, and in grade 5 on or as of July 1, 1933, and to receive the increased salary of grade 5 from July 1, 1934. He prayed that the District Court enter a declaratory judgment that his rights are as he contends and that the court issue a writ of mandamus to compel the Postmaster General to classify him in accordance with the provisions of the act. The Postmaster General answered, admitting all the essential facts contained in the petition and raising only questions of law. Petitioner demurred to the answer, and the District Judge sustained the demurrer. The respondent elected to stand upon his answer, and the court, in deference to the opinion of the Postmaster General that mandamus rather than a declaratory judgment would better serve the ends of administration in the Post Office Department, granted the writ. Judge Cox in a well-considered opinion, referring to the ruling of the Comptroller General which we have mentioned, says:

"Congress disapproved this ruling or decision of the Comptroller General as clearly appears from the report of June 13, 1934, of the House Committee on the Post Office and Post Roads. * * * That report, setting out in full the objectionable decision of the Comptroller General, recommended, and Congress embodied in the Act of June 27, 1934 (48 Stat. 1265), amending the Economy Act, the provision that in administering section 201 (Economy Act), as amended, 'all service rendered by postal

[5] 48 Stat. 1265, § 1.

[6] House Report No. 1983, 73d Cong., 2d Sess.

[7] 48 Stat. 962 (39 U.S.C.A. § 618a)—designated as "An Act to reclassify terminal railway post offices."

and other officers and employees prior to July 1, 1932, and subsequent to June 30, 1932, shall be credited to the officers or employes and such officers or employees promoted to the grade to which they would have progressed had section 201 (Economy Act) * * * not been enacted.'"

He says—and we think correctly:

"Clearer or more definite language could not have been used. By express command of the statute all service rendered within as well as prior to the economy period shall be credited to officers and employees and they shall be promoted to the grade to which they would have progressed had section 201 (Economy Act) not been enacted.

"This provision, enacted to clarify and make certain 'the purpose and intent of Congress' (Cong.Rec. 73d Congress, Vol. 78, No. 134, p. 12112), preserves to officers and employees automatic promotions in grade or rank, authorized by law, free from any adverse effect of the Economy Act. The character of that act is thus conclusively fixed as an act temporarily denying increase in compensation but in no wise restricting progress in grade or rank resulting from longevity of service."

Then, referring to the Reclassification Act which, as we have pointed out, was passed just two weeks earlier[8] than the interpretative amendment, the trial judge said:

"Obviously the two statutes are in pari materia. Where a general statute and a special statute have both been enacted, in terms that are inconsistent, the special statute may be accepted as governing the particular class or subject matter to which it is directed. But where the statutes can reasonably be reconciled, both must be given effect. Here the Economy Act in general terms was directed to automatic increases in compensation of all officers and employees of the United States. As if to prevent the possibility of argument that the Terminal Reclassification Act was intended to exclude railway postal clerks from the benefits of the amended Economy Act, the amendment of June 27, 1934, departing from the general language originally used, specifically declares that all services, including services in the economy period, rendered by postal and other employees shall be credited to them and such employees promoted accordingly.

"Moreover, just as the original Economy Act impliedly and the amendment to that Act of June 27, 1934, specifically recognized the distinction between advances in rank and increases in compensation, so also the Terminal Reclassification Act recognized this distinction in its proviso, 'that no employee in the postal service shall be reduced in rank or salary as a result of the provisions of this Act.'

"The Terminal Reclassification Act is obviously not retroactive. It plainly relates only to those automatic promotions of railway postal clerks to be made thereafter, and not to promotions in rank earned prior to that act. The right of the plaintiff to promotion to grade 5 accrued July 1, 1933. The Terminal Reclassification Act does not purport to affect that right. The Economy Act suspended only increases in his compensation up to June 30, 1934, and the amendment thereto of June 27, 1934, made sure that his right to promotion in rank accruing in the economy period should be preserved to him as if the Economy Act had not been enacted, and declares that he shall be promoted accordingly.

"Thus, giving each statute its full effect, the two statutes stand harmoniously together. There appears no real conflict or repugnancy between them. They seem so plainly to prescribe the duty of the Postmaster General to promote the plaintiff to grade 5 'as to be free from doubt and equivalent to a positive command.' Miguel v. McCarl, 291 U.S. 442, 451, 454, 54 S.Ct. 465, 467, 78 L.Ed. 901; Wilbur v. United States, 281 U.S. 206, 218, 219, 50 S.Ct. 320, 324, 74 L.Ed. 809."

Very little, in our opinion, need be added to this clear statement of the effect of the statute. The Economy Act suspended automatic increases in salary for the two years July, 1932, to July, 1934. Its language certainly goes no farther. The Comptroller General thought that it likewise abolished for the time being the effect of continuity of service on grades, and, presumably because the act lifting the prohibition contained no explanatory language, he ruled that it did no more than to restore as of July, 1934, the status both as to pay and grades existing as of July, 1932. The result of this, as we have seen, was to afford Congress the opportunity to place its own interpretation upon the scope and meaning of the language used in the act and thus to

---

[8] June 14, 1934, 48 Stat. 962 (39 U.S. C.A. § 618a), supra.

set· aside and overrule the Comptroller's decision by a specific mandate to the contrary. The language used in the amending Act is, that in the administration (of the act restoring pay increases) all services rendered by postal employees prior and subsequent to July 1, 1932, shall be credited to such employees and they shall be promoted to the grade to which they would have progressed had the act suspending automatic increases in compensation not been enacted. The purport of this language is unmistakable. Whether it be considered as explaining the original congressional intent or whether it be considered as the adoption of a new policy, in either case it is a positive, unequivocal command that the provisions of the Economy Act be considered for naught so far as concerns annual automatic advances in grades, and we think the better view is that this result would likewise follow even without this congressional expression because, as we have pointed out, the language of the original suspension related alone to increases in pay. The subsequent act restoring the provision specifically provided that it should not be considered to entitle any person to demand increases in pay for the period covered by the interdict. This clearly recognized that there had been a nonsuspension of the provision with relation to advance in grades, for otherwise, obviously, no automatic increase in salary could on any theory be claimed. We are, therefore, in accord with the opinion of Judge Cox that the fair interpretation of the language impels the conclusion that the original act applied alone to increases in pay and not at all to advancement in grade, and that the subsequent amendatory act was necessary only because of the contrary opinion of the head of the General Accounting Office.

■ But if this opinion be set to one side and if it be held that the amendment was the adoption of a new policy, the result so far as this case is concerned is the same. It is the last word by Congress on the subject, and the mere fact that it was not to be effective as to pay increases until July 1 following (the commencement of the fiscal year) cannot detract from its force. If Congress had meant by the Reclassification Act—passed, as we have seen, two weeks prior to the amendatory act and effective at once—to limit promotions already earned, it would have qualified the amendatory act by a provision that the advancement in grades therein declared should be subject to the limitations of the Reclassification Act. Nothing could be more inconsistent than to say in one breath that petitioner should be classified as of July 1, 1934, in grade 5, which he had reached or would have reached on July 1, 1933, and in the next that he should not be so classified but should be promoted only to grade 4. We think Congress, of necessity, must have realized the possibility of such a case as this; and we believe that if Congress had intended its legislation to have the meaning respondent contends for, it would have—as it could have—said so clearly. The very inconsistency we have mentioned seems to discredit respondent's position, but if proof is needed it is supplied by the language of the Reclassification Act (39 U.S.C.A. § 618a) to the effect "that no employee in the postal service shall be reduced in rank or salary as a result of the provisions of this Act." If petitioner, as we think, advanced to grade 5 on July 1, 1933, notwithstanding the Economy Act—though such advancement was effective as to increase in salary only after July 1, 1934 (and this, as we have said, is the inevitable result of a fair construction of the language of the Economy Act itself, fortified and confirmed by the language of the amendatory act),—obviously his classification as of July 1, 1934, in grade 4 reduced him in rank contrary to the terms of the applicable statutes.

■ The trial court, having reached this conclusion, was persuaded by counsel for the Government to issue the writ prayed for rather than find a declaratory judgment in petitioner's favor. In these circumstances we think the Government ought not to urge inapplicability of mandamus in a case involving, as the Government claims, assumption by the court of control of the independent affairs of a department of Government. But putting this observation to one side, we think the point is without merit. In this case the administrative officers of the Post Office Department had no discretion. The statute fixes the grades and the salaries pertaining to each and prescribes precisely how an employee shall progress from the one grade to the other. By stipulation the Postmaster General admits that petitioner's services have been satisfactory within the meaning of the statute, so that petitioner either progresses or does not progress entirely independently of the Postmaster General's control of departmental affairs. If the Acts to which we have referred mean what we think they mean, and what we think

they mean so clearly as to leave no room for dispute, then petitioner advances by virtue of an Act of Congress wholly without regard to any discretion on the part of the Department, for it is given no power to suspend the operation of the automatic promotion statute. The question, therefore, is not, as counsel for the Government insist, that the effect of mandamus is to invest petitioner with an office in defiance of respondent's right to control the internal affairs of his Department. It is not the writ which commands petitioner's promotion to grade 5, but the Act of Congress, which neither the Postmaster General nor this Court is at liberty to ignore.

Nor, as we think, is there any substance to the point that mandamus is not the proper remedy because petitioner could sue in the Court of Claims for the salary due him from July 1, 1934. Success in such a suit would not result in placing petitioner in grade 5, and hence the remedy is not adequate. What petitioner desires is a judicial determination of his right under the statutes to be placed in grade 5, for once there the statutes take care of his compensation. In the case of Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901, the remedy in the Court of Claims was decidedly more effective than it would be here, but the Supreme Court found no merit in the contention that such a circumstance was a bar to mandamus.

The answer to the question here depends on how clear the congressional intent is. If it is too clear to admit of reasonable difference of opinion, then mandamus is the appropriate remedy. If it is uncertain or if this court could say the Postmaster General reasonably reached the position to which he adheres, then mandamus could not issue. We have said enough already to show that we are of opinion the statutes are clear and unambiguous. Under circumstances which we think are similar the Supreme Court, in the Miguel Case, supra, said, quoting Wilbur v. United States, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809. "Where the duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command, it is regarded as being so far ministerial that its performance may be compelled by mandamus, unless there be provision or implication to the contrary."

And in the same opinion, quoting from Roberts v. United States, 176 U.S. 221, 20 S. Ct. 376, 379, 44 L.Ed. 443: "If the law direct him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree, a construction of its language by the officer. Unless this be so, the value of this writ is very greatly impaired."

We applied this rule in MacFarland v. U. S. ex rel. Russell, 31 App. D. C. 321,—a case in many respects like this. There Russell, a policeman in the Metropolitan Police, sought mandamus to compel his advancement from class 1 to class 2 on the force. The pertinent act of Congress provided that class 1 should consist of privates who had served less than three years; that class 2 should consist of privates who had served more than three years and less than five; and that class 3 should be composed of those who had served more than five years. Promotion from one class to the other was automatic and mandatory if the proper qualifications existed. Russell alleged that he had served in class 1 for the requisite time and had the necessary qualifications to warrant promotion. The Commissioners admitted that Russell had the necessary qualifications and defended on the ground that under their construction of the act Russell had not served in class 1 for three years because he had been transferred from one position to another within the Department, and they considered each position a new appointment within the meaning of the act. It appeared that Russell had been on the force for three years but had not held his present appointment for that period. This court construed the act and concluded that Congress had not intended the distinction which the Commissioners insisted on, and the construction of the act by this court seemed so obviously correct and reasonable that the judgment of the lower court issuing mandamus was affirmed. We think there is the same clarity of the statutes in this case. In both the appointing officer had a degree of discretion, for in both promotion was ultimately dependent upon the rendition of satisfactory service for a prescribed period; but in Russell's Case the necessary qualifications were—as they are here—conceded. In each case the officer refused to promote wholly because of his construction of the act in question. We held, as we have said, in that case—as we hold in this—that the only reasonable construction of the acts does not

sustain the government's position; and in this view mandamus should issue.

Argument is made in the briefs on the question whether or not the court below had jurisdiction under the Declaratory Judgment Act[9] to construe the statutes involved and declare their meaning. Since respondent has asked that, if relief be granted to petitioner, it be by mandamus rather than by declaratory judgment, and since the writ which will issue in accordance with this opinion will give petitioner complete relief, there is no necessity for our discussing the applicability of the Declaratory Judgment Act to a case of this sort. We, therefore, express no opinion on this point.

Judgment affirmed.